Sheila M. RIELY, Nancy K. Barto, and
Katherine A. Sabelko, Plaintiffs,

v.

Janet RENO, Attorney General of the
United States, and Janet Napolitano,
United States Attorney for the District
of Arizona, in their official capacities,
Defendants.

Civ–94–1058–PHX–RGS.

United States District Court,
D. Arizona.

Aug. 12, 1994.

Benjamin W. Bull, Nikolas T. Nikas, Phoenix, AZ, Jay Allen Sekulow, Washington, DC, for plaintiffs.

Frank W. Hunger, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, Janet Napolitano, U.S. Atty., Phoenix, AZ, David J. Anderson, Neil H. Koslowe, U.S.

Dept. of Justice, Civ. Div., Washington, DC, for Janet Reno, Janet Napolitano.

Alan H. Susman, Leon Benjamin Silver, Bonnie Lee Booden, Jaburg & Wilk PC, Phoenix, AZ, Celeste Lacy Davis, Legal Action for Reproductive Rights, Planned Parenthood Federation of America, New York City, for Planned Parenthood Federation of America, Inc., Planned Parenthood of Cent. and Northern Arizona, Inc., Planned Parenthood of Southern Arizona, Inc.

### ORDER

STRAND, District Judge.

## I.  INTRODUCTION

Sheila M. Riely, Nancy K. Barto and Katherine A. Sabelko (collectively, "Plaintiffs") filed this suit to challenge the constitutionality of the federal "Freedom of Access to Clinic Entrances Act of 1994" ("FACE"), Pub.L. No. 103–259, 108 Stat. 694 (1994) (to be codified at 18 U.S.C. § 248). Plaintiffs have named as Defendants Janet Reno, the Attorney General of the United States, and Janet Napolitano, the United States Attorney for the District of Arizona (collectively, "Defendants"). Plaintiffs allege violations of their First Amendment right to freedom of speech, freedom of the press and freedom of assembly; violations of their Due Process and Equal Protection rights; violations of their Eighth Amendment right to be free of excessive fines and cruel and unusual punishment; violations of the Tenth and Fourteenth Amendments; and violations of the Religious Freedom Restoration Act. Plaintiffs have requested a preliminary injunction preventing Defendants from enforcing FACE. Plaintiffs also seek a declaration that FACE is unconstitutional.

Defendants have moved for dismissal on the ground that Plaintiffs' claims are not ripe for review and on the alternative ground that Plaintiffs' Complaint fails to state a claim upon which relief may be granted. Planned Parenthood Federation of America, Inc., Planned Parenthood of Central and Northern Arizona, Inc., and Planned Parenthood of Southern Arizona, Inc. (collectively, "Intervenors") have been granted intervenor status and join in Defendants' motion.

Plaintiffs' motion for preliminary injunction and Defendants' and Intervenors' motions to dismiss were heard before this Court on July 21, 1994.

## II.  FACTUAL BACKGROUND

Prior to the enactment of FACE, Plaintiffs Barto and Sabelko distributed literature, displayed signs and pictures, and engaged in oral protest, educational speech and sidewalk counseling in opposition to abortion on public ways and sidewalks outside of abortion facilities. Barto Decl. ¶¶ 6, 7; Sabelko Decl. ¶¶ 6, 7. Plaintiffs Barto and Sabelko contend that some individuals may have found their communication offensive, provocative and traumatic. Barto Decl. ¶ 8; Sabelko Decl. ¶ 8. Plaintiffs Barto and Sabelko further contend that "some persons may experience a subjective feeling of apprehension that they are in physical danger or risk." Barto Decl. ¶ 10; Sabelko Decl. ¶ 10. However, Plaintiffs Barto and Sabelko have never knowingly caused bodily harm to any person with whom they where attempting to communicate. Barto Decl. ¶ 10; Sabelko Decl. ¶ 10. Plaintiffs Barto and Sabelko have also physically obstructed access to facilities providing reproductive health services by stepping in front of individuals attempting to enter the facility and by standing in anti-abortion picket lines that impeded the most direct and convenient access to the facility. Barto Decl. ¶¶ 11, 12; Sabelko Decl. ¶¶ 11, 12. Plaintiffs Barto and Sabelko contend that they find FACE vague and confusing and are concerned that engaging in the above-described activities will result in criminal prosecution and civil sanctions. Barto Decl. ¶ 13; Sabelko Decl. ¶ 13. Plaintiffs Barto and Sabelko claim that as a consequence they have been chilled in the exercise of their free speech rights. Barto Decl. ¶ 14; Sabelko Decl. ¶ 14.

Plaintiff Riely has also participated in expressive activities in opposition to abortion, including distributing literature, displaying signs and pictures, engaging in oral protest and sidewalk counseling, and engaging in educational speech about abortion outside facilities providing reproductive health services. Riely Decl. ¶¶ 2, 8. Plaintiff Riely believes that some of the persons with whom

she has communicated have felt "intimidated, frightened, and even coerced." Riely Decl. ¶ 11. Plaintiff Riely has also physically obstructed access to facilities providing reproductive health services by stepping in front of individuals attempting to enter the facility and by standing in anti-abortion picket lines that impeded the most direct and convenient access to the facility. Riely Decl. ¶¶ 12, 13. Unlike Plaintiffs Barto and Sabelko, Plaintiff Riely has engaged in acts of civil disobedience in violation of the law in order to protest against abortion. Riely Decl. ¶ 5. For example, prior to the enactment of FACE, Plaintiff Riely engaged in sit-ins at facilities providing reproductive health services that temporarily interfered with access to those facilities and resulted in her arrest and physical removal. Riely Decl. ¶ 6. Plaintiff Riely contends that she finds FACE vague and confusing and fears that she will be subject to arrest under FACE if she continues to engage in her expressive activities. Riely Decl. ¶ 14. Consequently, Plaintiff Riely contends that she has been "deterred and chilled" in the exercise of her constitutional rights. Riely Decl. ¶ 15.

## III. STATUTORY BACKGROUND

FACE provides in relevant part:

(a) PROHIBITED ACTIVITIES.—Whoever—

(1) by force or threat of force or by physical obstruction,[1] intentionally injures, intimidates[2] or interferes with[3] or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services[4];

(2) ... or

(3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services ...

shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c). ...

(b) PENALTIES.—Whoever violates this section shall—

(1) in the case of a first offense, be fined in accordance with this title, or imprisoned not more than one year, or both; and

(2) in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with this title, or imprisoned not more than three years, or both;

except that for an offense involving exclusively a nonviolent physical obstruction, the fine shall be not more than $10,000 and the length of imprisonment shall be not more than six months, or both, for the first offense; and the fine shall be not more than $25,000 and the length of imprisonment shall be not more than 18 months, or both, for a subsequent offense; and except that if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life.

(c) CIVIL REMEDIES.—

(1) RIGHT OF ACTION.—

(A) IN GENERAL.—Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a

---

1. "Physical obstruction" means "rendering impassable ingress to or egress from a facility that provides reproductive health services" or "rendering passage to or from such a facility ... unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4).

2. "Intimidate" means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." 18 U.S.C. § 248(e)(3).

3. "Interfere with" means "to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(2).

4. "Reproductive health services" refers to "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy." 18 U.S.C. § 248(e)(5).

facility that provides reproductive health services....

(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses. With respect to compensatory damages, the plaintiff may elect, at any time prior to the rendering of final judgment, to recover, in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation.

(2) ACTION BY ATTORNEY GENERAL OF THE UNITED STATES.—

(A) IN GENERAL.—If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, the Attorney General may commence a civil action in any appropriate United States District Court.

(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent—

(i) in an amount not exceeding $10,000 for a nonviolent physical obstruction and $15,000 for other first violations; and

(ii) in an amount not exceeding $15,000 for a nonviolent physical obstruction and $25,000 for any other subsequent violation.

(3) ACTIONS BY STATE ATTORNEYS GENERAL.—

(A) IN GENERAL.—If the Attorney General of a State has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, such Attorney General may commence a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any appropriate United States District Court.

(B) RELIEF.—In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, compensatory damages, and civil penalties as described in paragraph (2)(B).

18 U.S.C. § 248.

## IV. DEFENDANTS' MOTION TO DISMISS

### A. Justiciability

■ Defendants argue that this case should be dismissed on the ground that Plaintiffs have failed to allege a justiciable case or controversy because Plaintiffs' claims are "anticipatory, hypothetical, and speculative," i.e. that they are not ripe for consideration. Memorandum in Support of Defendants' Motion to Dismiss and in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defendants' Memorandum"), p. 3. In order for a case to be justiciable, the issues must be ripe for review. *See American–Arab Anti–Discrimination Comm. v. Thornburgh,* 970 F.2d 501, 510 (9th Cir.1991) (although plaintiffs had standing, case was nonjusticiable and district court should have stayed its exercise of jurisdiction because First Amendment issues were not ripe for review).

Defendants cite *Renne v. Geary,* 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) in support of their position that Plaintiffs' claims are not ripe. In that case, the plaintiffs were challenging the practice of deleting any reference to party endorsements from candidates' statements included in voter pamphlets. The plaintiffs, who were members of political parties, contended that they wanted their endorsements to be published and desired to read about candidates' endorsements in the voter pamphlets. The court found that there was no ripe controversy because the plaintiffs did not allege that they desired to endorse any particular candidate or that a particular candidate wanted to

include the plaintiffs' endorsement in his or her candidate statement.

Similarly, in *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), also cited by Defendants, the Supreme Court found that the plaintiffs' claims were not ripe for review. In that case, the plaintiffs alleged a "chilling effect" on the exercise of their First Amendment rights caused by the existence and operation of the Army's intelligence gathering and distribution system, a system that plaintiffs alleged was broader in scope than reasonably necessary for the accomplishment of a valid governmental purpose. The Court found that the plaintiffs' complaint amounted to a claim that they disagreed "with the judgments made by the Executive Branch with respect to the type and amount of information the Army needs and that the very existence of the Army's data-gathering system produces a constitutionally impermissive chilling effect upon the exercise of their First Amendment rights." *Id.* at 13, 92 S.Ct. at 2325. The Court, finding this claim to be unripe, distinguished claims where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Id.* at 11, 92 S.Ct. at 2324–25.

*Laird* was distinguished by the Ninth Circuit in *Sable Communications of California, Inc. v. F.C.C.*, 827 F.2d 640 (9th Cir.1987). In that case the plaintiff, a communications corporation, challenged on First Amendment grounds a statute regulating sexually suggestive telephone services. The statute had yet to be applied to the plaintiff; however, the court found that the plaintiff had raised a justiciable case or controversy. The court distinguished *Laird* on the ground that the statute was compulsory in nature and there was a possibility the government would invoke the statute against the plaintiff, given the fact that the government had announced that it considered the statute effective everywhere but New York and it had specifically

declined to agree not to enforce the statute against the plaintiff. Furthermore, one of the plaintiff's competitors had already been prosecuted under the statute. As the court explained, the plaintiff "should not have to wait until it is actually prosecuted to challenge the statute." *Id.* at 644.

In this case, Plaintiffs Barto and Sabelko have alleged that they want to continue to participate in picket lines that impede the most convenient access to facilities providing reproductive health services. Complaint ¶¶ 5.11, 5.12. Similarly, Plaintiff Riely alleges that she has in the past participated in sit-ins that blocked access to facilities providing reproductive health services and wishes to continue to participate in such sit-ins. Complaint ¶¶ 5.15. 5.16. Plaintiffs Barto and Sabelko also contend that some of the individuals to whom they speak experience a feeling that they are in physical danger and that they desire to continue to engage in expressive activity that may result in individuals feeling that they are in physical danger. Complaint, ¶¶ 5.09, 5.12. Clearly, Plaintiffs have alleged that they wish to engage in activity that could be construed as physical obstruction for the purpose of interfering with an individual's attempt to obtain reproductive health services in violation of the statute. *See* 18 U.S.C. § 248(a)(1). Plaintiffs have also alleged that they wish to engage in speech that they believe may put some people in apprehension of physical injury, speech possibly proscribed by 18 U.S.C. § 248(a)(1). Thus, Plaintiffs are challenging proscriptions to which they are prospectively subject. Furthermore, Defendants admit that FACE is being enforced [5] and have specifically refused to stipulate that they will not enforce FACE against Plaintiffs.[6] The Court finds that Plaintiffs have presented a justiciable case or controversy and should not be required to risk prosecution in order to challenge FACE.

**B. Failure to State a Claim**

Alternatively, Defendants urge this Court to dismiss Plaintiffs' Complaint for failure to

---

5. *See* Criminal Complaint in *United States of America v. Ronald Dean Brock, et al.,* attached as Exhibit 4 to Defendants' Memorandum.

6. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion for Revised Briefing and Hearing Schedule, pp 2–3.

state a claim upon which relief can be granted. For the following reasons, the Court will grant Defendants' motion.

### 1. First Amendment

#### a. FACE does not proscribe constitutionally protected speech or expressive activities.

The Court agrees with Plaintiffs that most of their activities are expressive activities that implicate First Amendment rights. *See, e.g., United States v. Grace,* 461 U.S. 171, 176–77, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (peaceful picketing and leafletting are expressive activities protected by the First Amendment); *Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) (right to assemble and pray on public property fully protected by First Amendment). The question, however, is whether FACE proscribes Plaintiffs' expressive activities or any other expressive activities protected by the First Amendment.

Plaintiffs complain that FACE impermissibly proscribes constitutionally protected expression in the form of pickets or sit-ins. However, the United States Supreme Court has upheld narrowly drawn statutes prohibiting such expressive conduct. *See Cox v. State of Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (upholding statute criminalizing picketing or parading near state courthouse "with the intent of interfering with, obstructing, or impeding the administration of justice"); *Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) (upholding statute preventing picketing and parading that "obstruct[s] or unreasonably interfere[s] with free ingress or egress to and from any ... courthouse"). Similar to the statute in *Cameron,* FACE only prohibits pickets and sit-ins that render impassable ingress to or egress from a facility providing reproductive health services or renders passage to such a facility unreasonably difficult or hazardous. 18 U.S.C. § 248(a)(1), (e)(2). As the *Cameron* court explained, the "[p]rohibition of conduct which has this effect [of interfering with ingress to or egress from a building] does not abridge constitutional liberty 'since such activity bears no necessary relationship to the free-

dom to ... distribute information or opinion.' " *Cameron,* 390 U.S. at 617, 88 S.Ct. at 1339 (quoting *Schneider v. New Jersey,* 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939).

Furthermore, the Supreme Court has explained that when a statute regulates "speech" and "nonspeech" elements "combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Texas v. Johnson,* 491 U.S. 397, 407, 109 S.Ct. 2533, 2541, 105 L.Ed.2d 342 (1989) (quoting *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). Congress has found that from 1977 to April 1993, more than 1000 acts of violence against abortion providers were reported in the United States. S.Rep. No. 117, 103d Cong., 1st Sess. 3 (1993). These acts included at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, 2 kidnappings, 327 clinic invasions and one murder. *Id.* In response to this perceived problem, Congress decided to enact legislation with, as Plaintiffs note, the purpose of preventing "the use of blockades, violence and other forceful or threatening tactics against medical facilities and health care personnel who provide abortion related services...." *Id.* at 2. Thus, Congress' purpose was to protect medical facilities and medical personnel from physical threats, not to restrict anti-abortion protesters' speech. Consequently, the Court finds that Congress has identified a "sufficiently important governmental interest" in regulating the nonspeech component of activity prohibited by FACE to justify the incidental limitations FACE may impose on the speech component of such activity.

#### b. FACE does not impose content-based restrictions on protected speech or expressive activities.

Plaintiffs also argue that FACE is an impermissive, content-based restriction on speech because, for example, it prohibits blocking a facility entrance in protest to abortion but does not prohibit blocking a facility entrance in protest to animal research. The Court disagrees that FACE

regulates protected speech or protected, expressive conduct. FACE merely regulates pure conduct (i.e., force or acts of physical obstruction that injure, intimidate or interfere with another's freedom of movement) and unprotected speech (i.e., threats). Plaintiffs have failed to cite, and this Court's own research has failed to find, any authority for the proposition that the First Amendment doctrine proscribing content- and viewpoint-based regulation applies to the regulation of such unexpressive conduct and unprotected speech.

■ Plaintiffs also contend that FACE is an unconstitutional content-based restriction on expression because whether their "anti-abortion speech" is considered criminal under FACE "depends on the likely communicative impact of the words on the recipient." Plaintiffs' Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("Plaintiffs' Memorandum"), p. 12. The Court recognizes that, in general, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County, Georgia v. Nationalist Movement,* — U.S. —, —, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992). However, in cases such as *Forsyth,* the Supreme Court has been concerned that speech not be curtailed because listeners may merely be offended, angered, or annoyed. *See Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (holding unconstitutional statute criminalizing use of abusive language tending to cause a breach of the peace); *Bachellar v. Maryland,* 397 U.S. 564, 570, 90 S.Ct. 1312, 1315, 25 L.Ed.2d 570 (1970) (voiding criminal conviction due to possibility that, given court's instructions, conviction resulted from finding that defendant's views were merely offensive to bystanders); *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) (holding unconstitutional ordinance proscribing conduct "annoying" to passersby).

■ In contrast, it is permissible to regulate speech to the extent that the communicative impact of the words on the listener is that of fear of bodily harm. *See Madsen v. Women's Health Center, Inc.,* — U.S. —, —, 114 S.Ct. 2516, 2529, 129 L.Ed.2d 593

(1994) ("Clearly, threats to patients or their families, however communicated, are proscribable under the First Amendment"); *United States v. Gilbert,* 813 F.2d 1523, 1531 (9th Cir.1987) ("There is no question that the proscription of force or threat of force is within the government's powers"), *cert. denied,* 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987); *Wurtz v. Risley,* 719 F.2d 1438, 1441 (9th Cir.1983) ("[T]hreats have traditionally been punishable without violation of the first amendment," at least where there "is a reasonable tendency to produce in the victim a fear that the threat will be carried out"). For example, in *United States v. Gilbert,* 813 F.2d 1523, the Ninth Circuit upheld the constitutionality of 42 U.S.C. § 3631(b) and (c), making it a crime to "by force or threat of force" willfully injure, intimidate or interfere with anyone because of his or her race, color, sex, religion or national origin and because he or she has been selling, purchasing, renting or otherwise occupying any dwelling. The court explained that an "illegal course of conduct is not protected by the first amendment merely because the conduct was in part carried out by language in contrast to direct action." *Id.* at 1529.

Similarly, in *United States v. Velasquez,* 772 F.2d 1348 (7th Cir.1985), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986), the Seventh Circuit considered a First Amendment challenge to 18 U.S.C. § 1513, a part of the Victim and Witness Protection Act of 1982, making it a crime to threaten to cause bodily injury to an individual or to threaten to damage that individual's property with the intent of retaliating against that individual for relating information regarding the commission of a federal offense. The court explained that a "threat to break a person's knees or pulverize his automobile as punishment for his having given information to the government is a statement of intention rather than an idea or opinion and is not part of the marketplace of ideas." *Id.* at 1357.

Finally, in *CISPES (Committee in Solidarity with the People of El Salvador) v. FBI,* 770 F.2d 468 (5th Cir.1985), the Fifth Circuit upheld the constitutionality of 18 U.S.C. § 112, making it a criminal offense to intimidate, coerce, threaten or harass a for-

eign official. The court found "no merit in the appellants' argument that the questioned statute impermissibly regulates the content of speech." *Id.* at 474.

Plaintiffs, relying on *Brandenberg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), contend that the only threats that may be proscribed are those that "tend to incite or produce imminent lawless action." The Court finds *Brandenberg* inapplicable. In *Brandenberg,* the Supreme Court recognized the principle that "constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. at 1829. Unlike in this case, in *Brandenberg* the Court was concerned with public speech directed to encouraging others to engage in violence or other unlawful activity. The Court did not consider the constitutionality of a statute prohibiting privately communicated threats such as are proscribed by FACE.

In *McCalden v. California Library Ass'n,* 955 F.2d 1214 (9th Cir.1990), *cert. denied, Simon Wiesenthal Center for Holocaust Studies v. McCalden,* —— U.S. ——, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992), a case cited by Plaintiffs, the appellees took a position similar to Plaintiffs', alleging that the First Amendment prohibited the imposition of civil liability for threats of violence unless the threats were "directed to inciting or producing imminent lawless action." *McCalden,* 955 F.2d at 1222 (quoting *Brandenberg,* 395 U.S. at 447, 89 S.Ct. at 1829). The Ninth Circuit rejected this argument. As the court explained:

> Both *Brandenberg* and *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) involved public speeches advocating violence, not privately communicated threats of violence as are alleged here. Privately communicated threats have traditionally been punishable where they have a "reasonable tendency to produce in the victim a fear that the threat will be carried out."

*McCalden,* 955 F.2d at 1222 (quoting *Wurtz v. Risley,* 719 F.2d at 1441).

### c. FACE does not impose viewpoint-based restrictions on protected speech or expressive activities.

Plaintiffs next contend that FACE is an impermissible viewpoint-based ban on speech because it discriminates only against anti-abortion expression. Plaintiffs note that FACE applies to an individual who spray paints the words "DEATH CAMP" on a facility because it provides abortion services but does not apply to an individual who paints the name of his gang on the same facility for no apparent reason. The Court finds this example unpersuasive.

First, Plaintiffs neglect to note that the language of FACE, which prohibits damaging or destroying the property of a facility because it provides counseling or referral services relating to the human reproductive system, would apply to an individual who spray paints the words "KEEP ABORTION LEGAL" on a facility providing counseling regarding abortion alternatives as well as to the individual who spray paints the words "DEATH CAMP" on a facility providing abortion services. Furthermore, FACE will apply to an individual who spray paints a facility because it provides reproductive health services whether he sprays the words "DEATH CAMP," sprays his gang symbol, or sprays random lines on the building. In other words, FACE will apply regardless of what viewpoint, if any, the individual's graffiti expresses.

Second, Intervenors are correct that it is an untenable position that conduct such as vandalism is protected by the First Amendment merely because those engaged in such conduct "intend[ ] thereby to express an idea." *Johnson,* 491 U.S. at 404, 109 S.Ct. at 2539 (quoting *O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678). *See also Roberts v. United States Jaycees,* 468 U.S. at 628, 104 S.Ct. at 3255 (although acts of invidious discrimination may communicate a particular point of view, such practices are not entitled to constitutional protection).

The Court also finds that Plaintiffs' reliance on *R.A.V. v. City of St. Paul, Minneso-*

*ta,* 505 U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) is misguided. In that case, the challenged statute prohibited placing, on private or public property, a symbol, object, appellation, characterization or graffiti "which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." The Court concluded that even if the statute was construed to only apply to "fighting words," it was still unconstitutional because it was both content-based and viewpoint-based. The Court found that the statute was content-based because it only sought to punish certain "fighting words"—those invoking hostilities based on race, gender, color, creed or religion. *Id.* at ——, 112 S.Ct. at 2547. The Court found that the statute was viewpoint-based because fighting words that do not themselves invoke race, color, creed, religion or gender could be used by those in favor of equality and tolerance but not by their opponents. *Id.* at ——, 112 S.Ct. at 2547-48.

Unlike the statute in *R.A.V.,* FACE is largely directed at regulating conduct that is unprotected by the First Amendment.[7] *See Wisconsin v. Mitchell,* —— U.S. ——, ——, 113 S.Ct. 2194, 2201, 124 L.Ed.2d 436 (1993) ("But whereas the ordinance struck down in *R.A.V.* was explicitly directed at expression (*i.e.,* 'speech' or 'messages,' [505] at [——], 112 S.Ct. at 2547), the statute in this case is aimed at conduct unprotected by the First Amendment"). For example, FACE regulates conduct in the form of force or physical obstruction that injures, places another in reasonable apprehension of bodily harm, or restricts another's freedom of movement. FACE also prohibits conduct that intentionally damages or destroys the property of a facility providing reproductive health services. Such conduct is not protected by the First Amendment even though it has the potential for being considered expressive activity. *See Mitchell,* —— U.S. at ——, 113 S.Ct. at 2199 ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment"); *Roberts v. United States Jaycees,*

468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984) ("[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact ... are entitled to no constitutional protection").

Defendants argue that the Supreme Court has made it clear that the mere fact that only one group's speech is restricted does not necessarily mean that the restriction is impermissibly content- or viewpoint-based. *See Madsen,* —— U.S. at ——, 114 S.Ct. at 2524. In *Madsen,* a state court judge fashioned an injunction that prohibited anti-abortion protestors from, amongst other things, blocking, impeding or in any manner obstructing or interfering with access to or ingress into and egress from any building or parking lot of an abortion clinic and from picketing or demonstrating within 36 feet of the clinic. The injunction was fashioned based on the court's finding that the protests were discouraging potential patients from entering the clinic and were causing physical side effects in other patients. The protestors challenged the statute on the grounds that it was content- and viewpoint-based because it only restricted the speech of anti-abortion protesters. The Court found that the "fact that the injunction ... did not prohibit activities of those demonstrating in favor of abortion is justly attributable to the lack of any similar demonstrations by those in favor of abortion." *Id.* at ——, 114 S.Ct. at 2523.

The Court explained that the principal inquiry in determining content neutrality "is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.'" *Id.* at ——, 114 S.Ct. at 2523 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)). The Court explained:

> Here, the state court imposed restrictions on petitioners incidental to their antiabortion message because they repeatedly violated the court's original order. That petitioners all share the same viewpoint re-

---

7. It is true that FACE also prohibits pure speech in the form of threats of force that place another in reasonable apprehension of bodily harm.

However, as discussed, *supra,* such threats are not protected by the First Amendment.

garding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group whose conduct violated the court's order happen to share the same opinion regarding abortions being performed at the clinic.

*Id.* at ——, 114 S.Ct. at 2524. The Court concluded that, given the lower court's purpose in imposing the injunction, the injunction was content- and viewpoint-neutral even though it was only directed at individuals opposed to abortion.[8] *Id.* at ——, 114 S.Ct. at 2524.

■ This Court reiterates its finding that FACE does not impinge on constitutionally protected speech or expressive activity. However, even if it did, as in *Madsen*, given Congress' findings as to the need for protecting those seeking or providing abortion services, the restrictions on Plaintiffs' speech would be "incidental to their anti-abortion message" and, therefore, permissible. *See Id.* at ——, 114 S.Ct. at 2524.

#### d. FACE is neither constitutionally vague nor overbroad.

■ Plaintiffs also contend that FACE is unconstitutionally vague and overbroad. The Supreme Court has explained that in cases involving a facial challenge to the overbreadth and vagueness of a statute, a court should first consider whether the statute is overbroad, and, assuming it is not, then consider whether it is unconstitutionally vague. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). As the Fifth Circuit has explained:

The vice of an overbroad statute in the First Amendment context is that "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression." Thus, the concern with an overbroad statute stems not so much from its application to completed

conduct, but rather from the possibility that the threat of its application may deter others from engaging in otherwise protected expression.

*CISPES*, 770 F.2d at 472 (citations omitted). Because "invalidation of a statute on overbreadth grounds risks total judicial abrogation of an otherwise valid and rational legislative scheme," a statute "need not fall *in toto* merely because it is capable of some unconstitutional applications." *Id.* at 472. Consequently, "in order to invalidate a statute on overbreadth grounds, the overbreadth 'must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 473 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973)). "Thus, a statute should not be invalidated unless it reaches a substantial number of permissible activities." *CISPES*, 770 F.2d at 473. Furthermore, "an important corollary of the 'substantial overbreadth test' is that a federal court, faced with the challenged overbreadth of a federal statute, must construe the statute to avoid constitutional infirmities, if such construction is possible." *Id.*

■ The objection raised by Plaintiffs is that it prohibits "protected First Amendment expression, like sidewalk counseling, direct person-to-person attempts at persuasion, and picketing." Plaintiffs' Memorandum, p. 35. Plaintiffs have failed to cite, and the Court fails to find, any provision of FACE that could possibly be construed to prohibit mere "sidewalk counseling." The only type of "direct person-to-person attempts at persuasion" that are prohibited by FACE is "persuasion" in the form of threats of bodily harm. As discussed, *supra*, such threats are not protected expression. The only picketing prohibited by FACE is picketing that obstructs one's passage to and from a facility providing reproductive health services. As discussed, *supra*, ordinances establishing similar limitations on picketing have been upheld.

---

8. This Court notes that the Supreme Court found that review of an injunction is different than review of a statute. However, the Supreme Court noted that injunctions should be subjected to higher levels of scrutiny. *Madsen, Id.* at ——, 114 S.Ct. at 2525.

Plaintiffs also contend that the statute is unconstitutional because it prohibits threats to harm oneself if another obtains an abortion. Construing the statute to avoid constitutional infirmities, *CISPES*, 770 F.2d at 473, the Court finds that, if such threats are constitutionally protected, they are not intended to be proscribed under the statute. Consequently, the Court finds that FACE is not unconstitutionally overbroad.

A statute is unconstitutionally vague if persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Zwickler v. Koota*, 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967) (original quotes omitted). The Court declines to find the provisions of FACE unconstitutionally vague.[9]

First, although Plaintiffs are able to envision situations in which some individuals may be uncertain as to the applicability of FACE, this does not mean that persons of common intelligence must guess at the meaning of such phrases as "force or threat of force" and "reasonable apprehension of bodily harm." Such provisions have been upheld in numerous cases involving First Amendment challenges, as discussed, *supra*. Second, the Court disagrees that the phrase "rendering passage to and from such a facility.... unreasonably difficult" is unconstitutionally vague in light of the Supreme Court's decision in *Cameron*, 390 U.S. at 616, 88 S.Ct. at 1335, upholding a state statute prohibiting picketing or mass demonstrations "in such a manner as to obstruct or unreasonably interfere with free ingress or egress." In that case the Court found that the terms "obstruct" and "unreasonably interfere" clearly did not require any guessing as to their meaning.[10] *Id.* at 616, 88 S.Ct. at 1338.

Finally, the Court disagrees that FACE is analogous to the statute in *Dorman v. Satti*, 862 F.2d 432 (2nd Cir.1988), *cert. denied*, 490 U.S. 1099, 109 S.Ct. 2450, 104 L.Ed.2d 1005 (1989). In *Dorman*, the statute at issue proscribed interfering with or harassing another person engaged in the lawful taking of wildlife. Unlike FACE, the statute in *Dorman* was found unconstitutionally vague because it did not define the terms "interfere with" and "harass." In this case, "interfere with" is defined as "to restrict a person's freedom of movement." The meaning of such language is clearly understood by an individual of average intelligence.

### 2. Fifth Amendment

Plaintiffs also argue that FACE is unconstitutional because it violates the Fifth Amendment. The Supreme Court has explained that the Due Process Clause of the Fifth Amendment forbids the federal government from denying individuals equal protection of the laws. *Vance v. Bradley*, 440 U.S. 93, 94 n. 1, 99 S.Ct. 939, 941 n. 1, 59 L.Ed.2d 171 (1979). Traditionally, courts have applied one of two different standards where a statute is challenged on equal protection grounds: strict scrutiny or rational basis. *Hoffman v. United States*, 767 F.2d 1431, 1434 (9th Cir.1985). Strict scrutiny is generally applied where the classification challenged in the statute is based on race, ancestry or alienage or the statute infringes upon a fundamental right. *Id.*

Plaintiffs, relying on *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), claim that this Court should evaluate FACE under the strict scrutiny standard because it infringes on the right of free speech. In *Mosley*, the Supreme Court considered an equal protection challenge to an ordinance regulating picketing next to a school. The ordinance allowed peaceful picketing on the subject of a school's labor management dispute but prohibited any other peaceful picketing. The Court found that because the ordinance affected First Amendment interests, the Equal

9. In Count 4 of the Complaint, Plaintiffs claim that FACE violates the Due Process Clause of the Fifth Amendment because it is unconstitutionally vague and, therefore, fails to adequately advise individuals as to the conduct it prohibits. Because the Court finds that the language of FACE is not vague, this claim must also fail.

10. Furthermore, the Court found that "unreasonably" is a "widely used and well understood word." *Cameron*, 390 U.S. at 616 n. 1, 88 S.Ct. at 1338 n. 1.

Protection Clause required that the ordinance be narrowly tailored to achieve its legitimate objectives. *Id.* at 101, 92 S.Ct. at 2293. Although the Court recognized that the City had an interest in preventing school disruption, the Court found that the City had failed to show that the ordinance was narrowly tailored because it had failed to show that "peaceful" nonlabor picketing was any more disruptive than "peaceful" labor picketing. *Id.* at 99–100, 92 S.Ct. at 2292.

The distinction between *Mosley* and the case presently before the Court is that the Court finds that FACE does not infringe on a constitutionally protected right. As discussed in Section IV.B.1.a, *supra,* FACE does not regulate protected speech or expressive conduct. Consequently, the heightened standard of scrutiny applied in *Mosley* is not applicable and the rational basis test is to be applied instead. Clearly, in light of its legislative history, FACE withstands scrutiny under the rational basis test. Moreover, even if *Mosley* was applicable in this case and a heightened standard of scrutiny was to be applied, the Court finds that FACE is narrowly tailored and that, in light of its legislative history, its objectives are legitimate. Consequently, Plaintiffs' Fifth Amendment claim must fail.

### 3. Eighth Amendment

Plaintiffs also argue that FACE violates the Eighth Amendment prohibition on cruel and unusual punishment and excessive fines. First, Plaintiffs, relying on *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), argue that sentencing provisions of FACE are not proportional to the crime. In *Solem,* the Supreme Court held that the Eighth Amendment requires a court to consider whether a punishment is proportional to the crime committed by comparing (1) the gravity of the offense with the harshness of the penalty; (2) the sentence imposed with sentences for other crimes in the jurisdiction; and (3) the sentence imposed with sentences imposed by other jurisdictions for the same crime. The Court notes that in *Harmelin v. Michigan,* 501 U.S. 957, ——, 111 S.Ct. 2680, 2686, 115 L.Ed.2d 836 (1991), Justice Scalia called into doubt the continued vitality of

*Solem* and suggested that the Eighth Amendment contains no proportionality guarantee. *But see Id.* at ——, 111 S.Ct. at 2702 (Kennedy, J. concurring) (*"stare decisis* counsels our adherence to the narrow proportionality principle that has existed in our Eighth Amendment jurisprudence for 80 years"). However, even if *Solem* remains good law, the Court finds that FACE does not violate the Eighth Amendment.

FACE provides for a term of imprisonment of no more than six months for a nonviolent physical obstruction and no more than 18 months for a subsequent nonviolent physical obstruction. For other violations of FACE, an offender can be sentenced to no more than one year for a first offense and no more than three years for a subsequent offense, although if bodily injury results the offender can be sentenced to no more than ten years, and if death results the offender can be sentenced to any term of years or life.

Plaintiffs argue that the "question here is whether the penalties of six months in jail ... and up to three years in prison ... may be said to be proportional to non-violent expression and expressive activities." Plaintiffs' Responsive Memorandum in Opposition to Planned Parenthood's Motion to Dismiss ("Plaintiffs' Responsive Memorandum"), p. 8. The Court has already determined that FACE does not unconstitutionally prohibit protected expression or expressive activities. The Court finds that the harshness of the penalties provided is commensurate with the gravity of the proscribed conduct. The Court also notes that the federal criminal code contains numerous comparable penalty provisions for crimes involving threats of violence and the infliction of bodily injury. Finally, the Court finds it important that FACE affords a sentencing court much discretion in determining the actual sentence imposed.

Plaintiffs also contend that the criminal fines imposed by FACE "bear no relation to any harm sustained by either a person seeking to approach an abortion facility or those affiliated with the facility" and therefore are excessive in violation of the Eighth Amendment. Plaintiffs' Responsive

Memorandum, p. 9. First, Plaintiffs have failed to show that the fines imposed by FACE are significantly greater than the fines imposed by similar statutes. Second, FACE imposes a fine of *no more than* $10,-000 for a first occurrence and $25,000 for subsequent occurrences. Thus, the statute properly allows a court to adjust the fine based on the particular facts in a given case.

■ Plaintiffs further contend that FACE's statutory damage provision, which allows for statutory damages in the amount of $5,000 per occurrence, violates the Eighth Amendment. Plaintiffs rely on cases applying the Eighth Amendment prohibition on excessive fines in the forfeiture context. *See, e.g. Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). As the Supreme Court noted in *Austin,* the threshold question that had to be addressed was whether forfeitures are properly considered "punishment," since the Eighth Amendment only limits the government's power to punish. —— U.S. at ——, 113 S.Ct. at 2805. The purpose of statutory damages is not to punish but to compensate. Consequently, Plaintiffs' argument must fail.

### 4. Congress' Authority to Enact FACE

Plaintiffs next contend that Congress is without authority to enact FACE pursuant to U.S. Const. art. I, § 8, cl. 3 ("The Commerce Clause"), and, therefore, FACE was enacted in violation of the Tenth Amendment. Defendants rely on *United States v. Lopez,* 2 F.3d 1342 (5th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 1536, 128 L.Ed.2d 189 (1994). In that case, a defendant was convicted of violating the "Gun–Free School Zones Act of 1990," 18 U.S.C. § 922(q), which prohibits possessing a firearm in a school zone. The defendant appealed his conviction, arguing that Congress was without power to regulate such activity. The Fifth Circuit held § 922(q) invalid on the grounds that "[n]either the act itself nor its legislative history reflect any Congressional determination that the possession denounced by section 992(q) is in any way related to interstate commerce or its regulation, or, indeed, that Congress was exercising its power under the Commerce Clause." *Id.* at 1366. The court

left for another day the determination of whether "with adequate Congressional findings or legislative history, national legislation of similar scope could be sustained." *Id.* at 1368.

■ First, the Court notes that there is Ninth Circuit authority in direct conflict with *Lopez. See United States v. Edwards,* 13 F.3d 291, 293 (9th Cir.1993) (upholding constitutionality of section 922(q) and reiterating Ninth Circuit's position that Congress need not "make express findings that a particular activity or class of activities affects interstate commerce in order to exercise its legislative authority pursuant to the Commerce Clause"). Second, the Court finds *Lopez* and *Edwards* distinguishable because in this case Congress has stated that it was exercising its power under the Commerce Clause when it enacted FACE and has made findings that the activities proscribed by FACE affect interstate commerce. *See* Freedom of Access to Clinic Entrances Act of 1994, Pub.L. No. 103–259, 108 Stat. 694, Sec. 2. The Committee on Labor and Human Resources ("the Committee") concluded that facilities providing reproductive health services are involved in interstate commerce both directly and indirectly and operate within the stream of commerce by purchasing medical supplies and instruments, often from other states, employing staff and leasing office space. S.Rep. 117, 103d Cong. 1st Sess. 31 (1993). In addition, the Committee found that many of the patients who seek services from these facilities engage in interstate commerce by traveling from one state to another to obtain these services. *Id.* Also, clinic employees sometimes travel across state lines to provide reproductive health services. *Id.* Furthermore, the Committee concluded that the activities prohibited by FACE have a negative effect on interstate commerce. *Id.* The Committee noted that clinics have been closed and rendered unable to provide services as the result of blockades and sabotage. *Id.* The Committee found that this resulted in less interstate movement of people and goods. *Id.*

■ Courts must defer to a congressional finding that regulated activity affects interstate commerce if there is any rational basis

**708**

for such a finding. *Hodel v. Virginia Surface Mining and Reclamation Ass'n Inc.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). The Court finds there is a rational basis for Congress' determination that the activity FACE regulates affects interstate commerce.

Plaintiffs also rely on *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), arguing that Congress exceeded its power under the Commerce Clause by failing to require the government to prove a connection to commerce in individual cases. In *Bass,* the respondent challenged his conviction pursuant to Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.App. § 1202(a). That statute made it a federal criminal offense for a person previously convicted of an offense to "receive[ ], possess[ ], or transport[ ] in commerce or affecting commerce ... any firearm." The respondent made two arguments. First, he argued that the statute should be read to require the government to show that his possession of a firearm was in or affecting interstate commerce. Second, he argued that if the statute was read to prohibit the possession of a firearm regardless of whether that possession was in or affecting interstate commerce, then the Court must find that Congress had exceeded its constitutional powers under the Commerce Clause.

The Court found that the statute was ambiguous on its face as to whether it required the possession to be in or affecting commerce. The Court concluded that because it was a criminal statute and the government's broad reading would "mark a major inroad into a domain traditionally left to the states," it would "refuse to adopt a broad reading in the absence of a clearer direction from Congress." *Id.* at 339, 92 S.Ct. at 518. Because the Court agreed with the respondent that the statute required the government to show that the possession was in or affecting commerce, the Court did not reach the respondent's second argument that Congress was without authority to proscribe possession of a firearm not in or affecting commerce. *Id.* at 347, 92 S.Ct. at 522. Importantly, although the Court chose to interpret the statute at issue in *Bass* as requiring the government to

show a connection with interstate commerce, it did not find that such an interpretation was necessary in order for the statute to be a permissible exercise of Congress' power under the Commerce Clause.

Moreover, the Supreme Court's decision in *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), further belies Plaintiffs' position. In *Perez,* the Court was confronted with the issue of whether Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891 *et seq.,* as construed and applied to the petitioner, was a permissible exercise by Congress of its powers under the Commerce Clause. The petitioner was a "loan shark" who used the threat of violence as a method of collection. The petitioner argued that loan sharking is a traditionally local activity that Congress could not permissibly regulate. The Court disagreed. The Court explained that as long as an individual is a member of a class that engages in activities that affect interstate commerce, then an individual cannot complain that Congress cannot permissibly regulate his or her individual activities. *Id.* at 153–154, 91 S.Ct. at 1361. As discussed, *supra,* Congress has made sufficient findings in support of its position that the activities prohibited by FACE do affect interstate commerce. Consequently, the Court finds that Congress acted within its authority under the Commerce Clause when it enacted FACE.

Plaintiffs also contend that Congress is without authority to enact FACE pursuant to U.S. Const. amend. XIV, § 5. Because the Court finds that the Commerce Clause provides sufficient authority for the enactment of FACE, the Court need not address this argument.

### 5. Fourteenth Amendment

In their Complaint, Plaintiffs also contend that by enacting FACE, Congress violated the Fourteenth Amendment by empowering the states, through their attorneys general, to engage in conduct violative of various constitutional rights guaranteed by the First, Fourth, Fifth, Eighth and Tenth Amendments. Intervenors are correct that none of the other challenged provisions of FACE violate any of these constitutional provisions.

Page 709 at top right.

Consequently, FACE does not violate these constitutional provisions by authorizing the state attorneys general to bring a civil action on behalf of individuals injured by those acting in violation of FACE.

#### 6. Religious Freedom Restoration Act

Plaintiffs also claim that FACE violates the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.* That act provides in pertinent part:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1(b). Plaintiffs claim that FACE violates their religion; however, Plaintiffs have failed to allege that their religion advocates the use of force or threats of force or the use of physical obstruction to make passage to a facility unreasonably difficult or hazardous. Furthermore, even if FACE did burden Plaintiffs' exercise of religion, as discussed in Section IV.B.1.a, *supra,* the Court finds that FACE was passed in furtherance of a compelling governmental interest in proscribing conduct that harms individuals, damages property and burdens interstate commerce, and that it is the least restrictive means of furthering that interest. Consequently, the Court finds that FACE does not violate the Religious Freedom Restoration Act.

### V. CONCLUSION

The Court finds that Plaintiffs have presented a justiciable case or controversy but have failed to state a claim upon which relief can be granted. First, the Court finds that Congress acted within its authority under the Commerce Clause when it enacted FACE. Second, the Court finds that FACE does not impermissibly regulate protected expression or burden religion. Instead, FACE is directed at regulating unprotected speech and conduct, and any regulation of protected speech is incidental to the content or viewpoint of that speech. Third, the Court finds that Plaintiffs have failed to show that FACE is vague or overbroad. Fourth, the Court finds the punishments imposed and the statutory damages allowed by FACE do not violate the Eighth Amendment prohibition against cruel and unusual punishment and excessive fines. Finally, having found that FACE does not violate the First, Fourth, Fifth, Eighth or Tenth Amendments, the Court finds that enforcement of FACE by state officials does not in any manner violate the Fourteenth Amendment.

Accordingly,

**IT IS ORDERED GRANTING** Defendants' and Intervenors' Motions to Dismiss (docs. # 33, 53).

**FURTHER ORDERED DENYING** Plaintiffs' Motion for Preliminary Injunction (doc. # 1) on mootness grounds.

**FURTHER ORDERED** dismissing this action with prejudice.